UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| Robert A. Politte, et al., | ) | Civil No. 07cv1950 AJB (WVG) |
|---|---|---|
| Plaintiffs, | ) | FINDINGS OF FACT AND |
| v. | ) | CONCLUSIONS OF LAW |
| United States of America, | ) | |
| Defendant. | ) | |

This is an action for refund by Robert A. and Joan M. Politte (hereinafter the "Polittes") and TRKSS, LLC pursuant to 26 U.S.C. § 7426(a)(4) of the Internal Revenue Code that came before the Court for a bench trial on September 26 to October 5, 2011.[1] The Polittes request the refund of $343,987.03, plus interest as provided by law, which the IRS required the Polittes to pay as a condition precedent to discharge the Polittes' two residential condominium units in San Diego from Federal Tax Liens. The federal tax liens were filed on or about May 23 and May 24, 2007, for the employment tax

---

[1] Plaintiffs also brought a second claim for damages pursuant to 26 U.S.C. § 7426(h), alleging that an employee of the Internal Revenue Service ("IRS") intentionally, recklessly or negligently disregarded provisions of the Internal Revenue Code (26 U.S.C. § 1, et. seq.), however, during trial after the Plaintiffs were fully heard on this claim, the Defendant moved for judgment pursuant to Federal Rule of Civil Procedure Rule 52(c). The Court entered judgment for the defendant on this claim pursuant to Rule 52(c), and more fully explained on the record, finding the Plaintiffs failed to demonstrate that the IRS employee recklessly, intentionally, or negligently disregarded any provision of 26 U.S.C. § 7426(h).

liabilities of RAJMP, Inc.[2] TRKSS, LLC requests the refund of $1,305,209.90 and $44,115.60, plus interest as provided by law, which was paid as a condition precedent to the IRS discharging TRKSS's assets from Federal Tax Liens filed by the IRS on or about May 23 and May 24, 2007, for the employment tax liabilities of RAJMP, Inc.

This Court has jurisdiction with regard to these requests for refund pursuant to 28 U.S.C. § 1346(e), and 26 U.S.C. §§ 7426(a)(4) and venue is properly in this Court because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, and a substantial part of the property that is the subject of the action was situated, within the Southern District of California.

Based upon the testimony and exhibits received into evidence at trial, and after full consideration of the legal arguments of all parties, and by a preponderance of the admissible evidence, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

### *Findings of Fact*

1. Robert A. and Joan M. Politte are husband and wife. They have five children together: Ted, Robin, Kelly, Shelly, and Sean. Robert Politte also had four children with a previous wife: Robert Jr., Dale, Patricia, and Terry. The Polittes personal residence is located at 186 Poco Calle, Golden, Colorado, 80401.

2. RAJMP, Inc. is a California S-corporation. During the periods at issue, RAJMP operated between six and ten Midas franchise shops in the San Diego area. Robert and Joan Politte collectively own 74% of the issued and outstanding shares of RAJMP. The remaining shareholders of RAJMP are all Politte family members, including their children. Robert Politte is RAJMP's Chief Executive Officer ("CEO") and its Director, and Joan Politte is RAJMP's Secretary. Richard Evans was RAJMP's Chief Financial Officer ("CFO") until November of 2005 when Ted Politte took over as its CFO.

3. TRKSS, LLC, is a limited liability corporation that operates three Midas franchise shops north of the San Diego area. The Polittes are the sole members of TRKSS. Robert Politte is TRKSS's

---

[2] RAJMP Inc. ("RAJMP") was a California corporation that owned and operated 10 Midas franchises in and around the San Diego area. RAJMP had a substantial employment tax liability in the amount of approximately $5 million from 1998 through 2005. Plaintiffs had no knowledge of this liability until November, 2005.

1  CEO and Richard Evans was its CFO until November of 2005. The Board of Governors of TRKSS
2  includes the Polittes and also included, up until November of 2005, Richard Evans.
3      4.   The Polittes formed both RAJMP and TRKSS for the purpose of operating Midas
4  franchises in and around the San Diego, California and TRKSS and RAJMP both have their principal
5  place of business located at 3136 Kurtz St., San Diego, California, 92110.
6      5.   TRKSS and RAJMP had the same management team. Victor Anderson was the Director
7  of Operations, Pete Gaalaas was the General Manager, Dale Politte, and later Bill Frantz, were the
8  Human Resources Directors, and Jay Hale was the Payroll Clerk. Richards Evans was the CFO (or
9  comptroller) for both entities. Nevertheless, Robert Politte, not Richards Evans, would communicate
10 with the Midas Accounting Department directly to discuss matters pertaining to the shops.
11      6.   Although Robert Politte did not live in San Diego, he was heavily involved in the
12 management of RAJMP and TRKSS. Robert Politte called the Midas offices two to three times each day
13 to speak with his store managers. He spoke with Mr. Evans on a daily basis. Robert Politte set the
14 salaries for the employees, regularly signed corporate checks, wrote the policies and procedures manual
15 for the shops, helped create the budgets for the stores, decided how to allocate shared expenses between
16 RAJMP and TRKSS, administered the companies' employee education program, negotiated and
17 obtained loans on behalf of the entities, made hiring and firing decisions, and oversaw the management
18 team for RAJMP and TRKSS.
19      7.   Although Richards Evans was, by title, the CFO of RAJMP and TRKSS, Robert Politte
20 often directed Richard Evans' actions.  Robert Politte would often write Richards Evans instructions on
21 how to account for and expense certain business expenses and would often include instructions
22 regarding capital costs, accrual methods, and depreciation for purposes of their federal tax treatment.
23 Robert Politte gave instructions to Richards Evans regarding the payment of rent, taxes, and expenses
24 by RAJMP for other Politte-owned entities, and expenses paid by RAJMP for non-RAJMP matters.
25 Robert Politte also advised Richards Evans on employment, salary, and bonus matters for RAJMP and
26 TRKSS employees.
27      8.   Richards Evans always followed the instructions given to him by Robert Politte, and did
28 not challenge any of Robert Politte's characterizations of business expenses.  Some of these business

expenses included Robert Politte taking his family on what was characterized as "business trips" to Hawaii and Australia. Robert Politte also characterized paying for season tickets to the Denver Nuggets and Colorado Avalanche, both teams which play in Denver where Robert and Joan Politte reside as "business expenses," despite the fact that RAJMP only did business in the San Diego area. Robert Politte also directed Richard Evans to pay expenses to vendors in Colorado and elsewhere outside of California with RAJMP funds.

9. Robert Politte wrote the operations manual that governed operations for both TRKSS and the RAJMP. The operations manual made no distinction between shops operated by RAJMP and those operated by TRKSS and further provided that employees, parts, and supplies could be transferred between any of the RAJMP and TRKSS shops, and such transfers occurred on a regular basis.

10. Robert Politte would conduct monthly meetings with all the shop managers at the RAJMP/TRKSS headquarters. Joan Politte would often speak at the meetings as well. At these meetings, no distinction was made between shops operated by RAJMP and those operated by TRKSS.

11. RAJMP financed the operations of TRKSS and would transfer funds to TRKSS without a written agreement, terms, or consideration and, for the most part, without repayment. In 1998, RAJMP transferred a total of $275,000 to TRKSS. The money was exchanged without any written documentation of the agreement, its terms for repayment or recourse. RAJMP's financial records indicated that in 2001, TRKSS had only paid back $65,000 and no interest was charged. In 2004 alone, RAJMP transferred $50,000 to TRKSS on March 23; transferred another $25,000 to TRKSS on September 15; and transferred an additional $7,500 to TRKSS on September 17.

12. TRKSS had no employees, instead TRKSS "leased" its employees from RAJMP. This arrangement was also made without a written agreement, without repayment terms, and without recourse. There was no due date for payment for the employee services, and although TRKSS would often neglect to pay RAJMP for its lease of the RAJMP employees, RAJMP never sought recourse against TRKSS for failure to pay.

13. TRKSS and RAJMP shared the same American Express account. TRKSS allowed its customers to pay with an American Express card and those funds were deposited into RAJMP's

account with American Express. The CFO would adjust accounts thereafter, although precision in this regard was lacking.

14. Advertising for all of the Midas franchise shops owned by TRKSS and RAJMP was done collectively.

15. While TRKSS did obtain loans in its name, the address provided on the loan documents was not the corporate headquarters of TRKSS, instead it was the Polittes' personal address in Colorado. On at least one occasion, RAJMP was a guarantor for a TRKSS loan.

16. TRKSS purchased several timeshare condos in Hawaii from RAJMP by waiving a $25,000 debt owed to it by RAJMP. Likewise, RAJMP assigned its rights under a purchase agreement of a Midas store located in Oceanside, CA, to TRKSS for the nominal sum of one dollar ($1.00). RAJMP's financial records reflect that between 1998 and 2001, TRKSS owed RAJMP between $210,000 and $275,000.

17. The Polittes used RAJMP corporate funds to finance extensive remodeling of their home in Golden, Colorado. The Polittes signed RAJMP corporate checks totaling over $828,000 for this purpose. The Politte's rationalized the disbursement's as "home" office expense and money otherwise owed them by RAJMP, however, this was done with a total lack of corporate formality, arms length dealing, or documentation.[3]

18. The Polittes used more than $50,000 of RAJMP corporate funds to pay for their children's college tuition. The Polittes also used TRKSS corporate funds in excess of $145,000 for this purpose. RAJMP funds were also used to pay for the accommodations of some of the Politte children while they were in college. However, the only written corporate policy called for reimbursement to

---

[3] Even if RAJMP owed substantial unpaid rent or other monies to the Polittes, the unfettered use of company checks for direct payment of personal expenses from a special account, called "Due From Shareholders," defied corporate accounting logic and the separate status of the corporate entity. This was little more than a "slush fund" for the Polittes, and significant evidence of their dominion and control of the corporate entity, and their ignorance of the separateness of the corporate entities in this case.

employees, not direct payment to institutions. Allegedly this policy was amended orally by Robert Politte.[4]

19.  The Polittes used RAJMP funds to pay for expenses incurred by various other entities that they owned that conducted business in Colorado, Nevada and Hawaii. More than $500,000 of RAJMP funds were used for this purpose. The Polittes also used $130,000 of RAJMP funds to finance the operations of an entity with their son, Ted Politte.

20.  The Polittes used more than $85,000.00 in RAJMP funds to pay for luxury vehicles for Mrs. Politte's use in Colorado.

21.  Although RAJMP did not own any real property, between 2000 and 2005, RAJMP frequently paid the personal property taxes for property owned by the Polittes or entities owned and controlled by the Polittes.

22.  The financial records of RAJMP would sometimes reflect the money withdrawn by the Polittes or any of the entities owned or controlled by the Polittes from RAJMP in a special account called "Due From Shareholders." This account reflects that for the year 2002, the Polittes owed RAJMP in excess of $700,000. That same year, RAJMP operated at a loss of $127,000. For 2003, the Polittes owed RAJMP in excess of $960,000, and that same year RAJMP operated at a loss of $164,000. In 2004, RAJMP operated at a loss of $50,000 and the Polittes owed RAJMP over $1,000,000.00. RAJMP finally turned a profit in 2005, approximately $2.6 million, but the Polittes owed over $1.1 million to RAJMP that year.

24.  The Polittes repeatedly used RAJMP funds to finance the operations of various other entities that they owned and operated. RAJMP paid the property taxes for real property held by RAJMP of Nevada, LLC, a purportedly separate entity doing business in Las Vegas. Mr. Politte acknowledges using RAJMP funds to finance real estate purchases by RAJMP of Nevada. As a result, in 2004 alone, RAJMP of Nevada was indebted to RAJMP, Inc. in excess of $600,000. When RAJMP dissolved in 2005, RAJMP of Nevada owed RAJMP a balance of $643,294.00.

---

[4] It bears mentioning that the education reimbursement plan was administered to the greater benefit of the Politte children and certain key employees, as opposed to equally among the rank and file. Additionally, the Politte children were often only nominal employees, likely solely to defray the education expense at the corporations expense.

25. RAJMP paid expenses related to timeshares owned by Hawaii TS, LLC. Between 2002 and 2005, Hawaii TS, LLC owed RAJMP as much as $357,000 dollars. When RAJMP dissolved in 2005, Hawaii TS, LLC owed RAJMP a balance of $262,446.50.

26. The Polittes used RAJMP funds to finance family vacations to Hawaii and Mexico by designating them as "shareholder meetings." However, no formal shareholder meetings were held, no agendas were ever made, and no minutes were ever recorded. If business matters were discussed at all on these vacations, it was informally and it would concern both RAJMP and TRKSS.

27. The Polittes did not observe business formalities with respect to their "landlord/tenant" relationship with RAJMP. While RAJMP purportedly operated the ten Midas shops in the San Diego area, the Polittes were owners of the land and/or buildings for seven of these shops. For those seven shops, the Polittes purported to rent the land and/or buildings to RAJMP. However, RAJMP did not always pay the rent due to the Polittes. Often, RAJMP would pay the Polittes' mortgage on the rented property directly to the mortgage company on behalf of the Polittes. The existence of this payment arrangement is not documented and in some instances, despite the fact that the Polittes' mortgage was less than the rent owed to them by RAJMP, RAJMP never paid the difference owed to the Polittes, nor did the Polittes seeks recourse for the underpayments. Further, even where the Polittes did not receive rental income, they nevertheless claimed that they did on their federal income tax returns.

28. The Polittes did not observe business formalities with respect to the Crown Point Condos. The Polittes used over $46,000 of TRKSS funds to pay for the mortgage on the Crown Point Condos. RAJMP paid the homeowner's association fees on the condos, while TRKSS paid the mortgage. The loans fees associated with the refinance of the Crown Point Condos mortgages were paid by TRKSS, not the Polittes. At Robert Politte's direction, the payments for the fees and mortgage were automatically deducted from the corporate bank accounts of RAJMP & TRKSS. RAJMP also paid for some remodeling that the Polittes did on the condos.

29. While the Polittes were listed as the buyers on the purchase contract of the Crown Point Condos, the Polittes used the business headquarters address of RAJMP, which is also the business headquarters address for TRKSS in the purchase contract. Further, the Polittes used the business

address of RAJMP of Nevada, LLC as their address on the Grant Deed. RAJMP of Nevada, LLC is an entity formed by Robert Politte that has the same ownership structure as RAJMP, Inc.

30. Mr. Politte used the Crown Point condos as office space in connection with his job duties with RAJMP. Mr. Politte stayed in the condos when traveling on RAJMP business matters to San Diego. Ted Politte rented one of the condos while he was an employee of RAJMP. There was no written rental agreement. Fair market value for the rent of the condo was approximately $1000, but Ted Politte did not pay any rent.

31. The Polittes' federal income tax return for the years 2000, 2001, 2002, 2003, 2004, and 2005 shows zero rental income from the Crown Point Condos. Only after the IRS' audit of RAJMP, in 2006, did the Polittes' federal income tax return for the year 2006 reflect $8,750.00 in rental income from both Crown Point Condos.

32. Although TRKSS, and not the Polittes, paid the mortgage on the Crown Point Condos, the Polittes claimed mortgage interest and property tax deductions on their federal income tax returns for the Crown Point Condos for the years 2000, 2001, 2002 and 2006.

### *Conclusions of Law*

### I.   Federal Tax Liens

33. Under the Internal Revenue Code, where a taxpayer is "liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. As the statute indicates, no action by the United States is necessary, a statutory federal tax lien arises automatically as soon as an individual refuses to pay after demand.[5] The lien continues until the liability for the amount assessed is satisfied or becomes unenforceable by reason of lapse of time. 26 U.S.C. § 6322. This statutory provision imposing a lien "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719–20 (1985).

---

[5] *See In re Berg*, 188 B.R. 615, 618 (9th Cir. BAP 1995) ("A tax lien in favor of the United States arises by operation of law if a person is unable to pay a tax liability after demand for payment is made."); *United States. v. Donahue Industries, Inc.*, 905 F.2d 1325, 1330 (9th Cir. 1990).

34. Federal tax liens encumber property held by the taxpayer's nominee or alter-ego. Courts have construed the terms "property" and "rights to property" for the purposes of 26 U.S.C. § 6321 to include "not only the property and rights to property owned by the delinquent taxpayer, but also property held by a third party if it is determined that the third party is holding the property as a nominee or alter ego of the delinquent taxpayer."[6]

35. A notice of federal tax lien is separate and distinct from the statutory tax lien. The § 6321 statutory lien creates the United States' interest and the notice of federal tax lien recorded in county recorder's offices establishes priority against certain enumerated creditors under § 6323. Compare 26 U.S.C. § 6321 with § 6323. The notices of nominee or alter-ego federal tax lien at issue in this case did not create the tax lien on Plaintiffs' property, but merely protected the Government's interest in the taxpayers' property and priority against other creditors who may qualify under § 6323 as bona fide purchasers, secured creditors, and other categories set out in § 6323(a).[7]

36. In *United States v. Williams*, the Supreme Court authorized a third party to bring a refund action after paying someone else's taxes in full to remove a federal tax lien from her property. 514 U.S. 527, 538–40 (1995). Following Williams, Congress enacted § 7426(a)(4), and recent cases have noted that § 7426 is now the only avenue for third party actions. *See, e.g., First Am. Title Ins. Co. v. United States*, 520 F.3d 1051, 1053 (9th Cir.2008). This section of the Internal Revenue Code provides in full:

> If a certificate of discharge is issued to any person under section 6325(b)(4) with respect to any property, such person may, within 120 days after the day on which such certificate is issued, bring a civil action against the United States in a district court of the United States for a determination of whether the value of the interest of the United States (if any) in such property is less than the value

---

[6] *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977)); *see also Macklin v. United States*, 300 F.3d 814, 818 n.2 (7th Cir. 2002); *Towe Antique Ford Found. v. I.R.S.*, 791 F. Supp. at 1454 (D. Mont. 1992), aff'd, 999 F.2d 1387 (9th Cir. 1993).

[7] *See In re Berg*, 188 B.R. at 618 ("A Notice of Federal Tax Lien must, however, be filed before a tax lien will be effective against third parties."); *Walker v. United States*, No.04-5448, 2008 WL 576791, at *1 (D.N.J. Feb. 29, 2008) ("The notices of federal tax liens protect the government from third-party claims against the Walkers' property in accordance with the provisions of Section 6323 of the Code. The notices do not affect the statutory liens that arose automatically against the Walkers."); *Gass v. U.S. Dept. of Treas.*, No. 98-0075, 1999 WL 250890 at *8 (D. Colo. Mar. 30, 1999) (holding that any procedural irregularities with respect to a notice of federal tax lien does not affect the validity of the statutory tax lien).

determined by the Secretary. No other action may be brought by such person for such a determination.

26 U.S.C. § 7426(a)(4). "For purposes of an adjudication under [§7426(a)], the assessment of tax upon which the interest or lien of the United States is based shall be conclusively presumed to be valid." 26 U.S.C. § 7426(c); *accord First Am. Title Ins. Co.*, 520 F.3d at 1053 ("[T]here can no longer be a good argument for allowing a third-party challenge to an assessment, barred by § 7426.").

## II.   *Plaintiffs' Claim for Refund Under § 7426*

37.   Plaintiffs' TAC asserts claims for refund under § 7426(a)(4) seeking "a determination that the United States' interest in Plaintiffs' property (with respect to the Certificates of Discharge of Federal Tax Lien under 26 U.S.C. § 6325(b)(4) issued by the IRS) are zero." The property referred to is defined specifically as two categories: (1) certain business assets of TRKSS; and (2) two condominiums owned by Robert and Joan Politte.

Before ruling on the Plaintiffs' claims for refund, the Court must conduct a de novo review of the agency's determination. *See R.E. Dietz Corp. v. United States*, 939 F.2d 1, 4 (2d Cir. 1991) (stating that in a de novo review, "[t]he factual and legal analysis employed by the Commissioner is of no consequence to the district court"). As such, the Court will not look at the IRS's reasoning behind its determination.[8] Instead, the Court must apply the law to the facts presented before them.[9] Thus, for Plaintiff's § 7426(a)(4) claim, the question to be resolved by this Court based on the record before it is whether the Plaintiffs are the nominees or alter-egos of RAJMP, and not whether the IRS was correct in reaching this conclusion.

---

[8] *See Kenco Restaurants, Inc. v. Comm'r*, 206 F.3d 588, 596–97 (6th Cir. 2000) ("courts do not examine the underlying motives or policy of the Commissioner's determination); *see also Anastasato v. Comm'r*, 794 F.2d 884, 886–87 (3d Cir. 1986); *Flamingo Fishing Corp. v. United States*, 31 Fed. Cl. 655, 657–58 (1994); Katz v. United States, No. 91-5623, 1992 WL 103006, *1 (E.D. Pa. May 6, 1992) ("plaintiff will not be permitted to delve into the procedural mechanisms employed by the IRS"); *Garity v. United States*, 81-2 U.S.T.C. (CCH) P 9599, 1980 WL 1765, at *2 (E.D. Mich. May 20, 1980) ("the opinions, impressions, conclusions and reasoning of IRS agents are irrelevant . . . . Resolution of the[ ] issues depends solely on application of the pertinent law to the facts of [the] case . . . . [T]he opinions of individual IRS agents regarding their propriety are immaterial.").

[9] *See LiButti v. United States*, 107 F.3d 110, 119–20 (2d Cir. 1997)("noting that "[i]t was incumbent on the district court to determine" whether an entity was the taxpayer's nominee); *Mayes v. United States*, 86-2 U.S. Tax Cas. (CCH) ¶ 9607 at 85,401 (W.D. Mo. 1986); *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. United States*, 487 F. Supp. 801, 805 (E.D.N.C. 1979) ("[T]he court does not sit in judgment of the Commissioner; the court places itself in the shoes of the Commissioner.").

### III. U.S. Bears Burden of Proof

38. The United States bears the burden of proof on Plaintiffs' claim for refund under § 7426(a)(4) to establish, by a preponderance of the evidence, that Plaintiffs are the nominees/alter-egos of RAJMP.[10]

39. The nominee and alter-ego analyses, though distinct, are more similar than they are different. Courts have rejected the overly rigid approach of attempting to conduct each analysis separately, instead preferring application of the overall guiding principles that apply to both.[11] With this in mind, the defining characteristics of each analysis are set forth below.

#### A. Nominee Status

40. "Nominee status is determined by the degree to which a party exercises control over an entity and its assets." *United States v. Bell*, 27 F.Supp.2d 1191, 1195 (E.D. Cal. 1998). "The nominee theory attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner." *Richards v. United States*, 231 B.R. 571, 578 (E.D. Pa. 1999). The nominee theory is utilized to determine whether property should be construed as belonging to the taxpayer if they treated and viewed the property as their own, in spite of the legal machinations employed to distinguish legal title to the property. *Id.*

41. Although the nominee theory is not well developed under California law, where "[state] law fails to delineate a test . . . [courts] are guided by the common-law factors generally applied by

---

[10] *See United States v. Reed*, 168 F. Supp.2d 1266, 1268 (D.Ut. 2001); *United States v. Marsh*, 114 F.Supp.2d 1036, 1045 (D.Hi. 2000); *United States v. Secapure*, No. 07-1050, 2008 WL 820719, at *7 (N.D. Cal. Mar. 26, 2008); *Cheung, Inc. v. United States*, No. 04-2050, 2006 WL 2473487, at *5 (W.D. Wash. Aug. 28, 2006); *Sequoia Prop. & Equip. Ltd. v. United States*, No. 97-5044, 2002 WL 31409620, at *12 (E.D. Cal. Sept. 19, 2002).

[11] *See* 911, 2009 WL 2973300, at *29 ("[m]any of the[alter-ego] factors overlap with the nominee analysis"); *Sumpter v. United States*, 302 F. Supp. 2d 707, 721 (E.D. Mich. 2004) (finding "the distinction between the two theories is largely immaterial"); *United States v. Taylor*, 2001 WL 1636505, at *6 (D. Minn. Oct. 24, 2001) (referring to the "nominee/alter ego doctrine" and "alter ego/nominee theory"); *United States v. Engels*, 2001 WL 1346652, at *6 (N.D. Iowa Sept. 24, 2001) (finding "no significant practical differences between the terms 'nominee' and 'alter ego'"); *United States v. Klimek*, 952 F. Supp. 1100, 1113–14 (E.D. Pa. 1997) (concluding that certain entities were "nominees and alter egos" of defendant without separate analysis of each theory); *Tri-State Equip.*, 1997 WL 375264, at *12 ("Obviously, both doctrines share many common elements.").

federal courts to determine the existence of a nominee relationship."[12]  "Courts throughout the Ninth Circuit rely on the following six factors to determine nominee status":[13]

> (1) Whether no consideration or inadequate consideration is paid by the nominee;
>
> (2) Whether the property was placed in the name of the nominee at a time the taxpayer could have anticipated litigation or liabilities;
>
> (3) Whether a close relationship between the transferor and the nominee exists;[14]
>
> (4) Whether the parties to the transfer failed to record the conveyance;[15]
>
> (5) Whether the transferor retained possession; and
>
> (6) Whether the transferor continues to enjoy the benefits of the transferred property.

*Secapure*, 2008 WL 820719, at *7 (collecting cases).  "The court should consider the totality of the circumstances rather than single out the presence or absence of one particular factor." *911 Mgmt. v. United States*, No. 08-0047, 2009 WL 2973300, at *7 (D. Or. Sept. 10, 2009). "No factor can dispose of the issue itself, and no factor is necessarily required in order to find nominee status."[16]

---

[12] *United States v. May*, No. 07-10531, 2007 WL 3287513, at *2 (11th Cir. Nov. 8, 2007) (citing *Battle v. United States*, No. 06-0109, 2007 WL 1424553, at *5 (E.D. Tex. Feb. 7, 2007) ("As noted by the Government, however, Texas courts have not set forth factors for determining whether an entity is a nominee of another. When Texas law applies to an issue, but Texas law does not address that issue, federal courts will look to federal law for guidance."); *accord Cody v. United States*, 348 F. Supp. 2d 682, 694 (E.D. Va. 2004) ("[F]ederal courts sitting in states whose law of nominee ownership is similarly undeveloped have typically looked to nominee ownership criteria employed in other federal tax collection cases."); *Towe Antique Ford Found.*, 791 F. Supp. at 1454 (applying case law from other jurisdictions because state law did not set forth a test for when a nominee relationship arises).

[13] *E.g., United States v. Lang*, No. 06-2648, 2008 WL 2899819, at *4 (S.D. Cal. July 25, 2008); *United States v. Secapure*, No. 07-1050, 2008 WL 820719, at *7 (N.D. Cal. Mar. 26, 2008); *Cal. Fruit. Int'l v. Jeanne Spaich*, No. 04-2494, 2006 WL 2711664, at *4–5 (E.D. Cal. Sept. 21, 2006); *Sequoia Prop. & Equip. Ltd. v. United States*, No. 97-5044, 2002 WL 31409620, at *14 (E.D. Cal. Sept. 19, 2002); *Tri-State Equip. v. United States*, No. 94-1033, 1997 WL 375264, at *10–11 (E.D. Cal. Apr. 21, 1997).

[14] Plaintiffs do not dispute that this factor is satisfied. (Doc. No.148-2, at 14.)

[15] Where, as here, there is no conveyance of real property, but instead a transfer of funds with which to purchase the real property, the relevant question under the fourth prong of the nominee analysis shifts from whether a conveyance was recorded to "whether the parties adhered to the formalities one would expect them to adhere to." *911 Mgmt.*, 2009 WL 2973300, at *25.

[16] *Turk v. IRS*, 127 F. Supp. 2d 1165, 1167 (D. Mont. 2000); *accord Richards*, 231 B.R. at 578 ("these factors should not be applied rigidly or mechanically").

42. No actual conveyance of property from the taxpayer to the nominee is required in order to establish a nominee relationship:

> Although in many instances the delinquent taxpayer will have transferred legal title to a third party, an actual transfer of legal title is not essential to the imposition of a nominee lien. A delinquent taxpayer who has never held legal title to a piece of property but who transfers money to a third party and directs the third party to purchase property and place legal title in the third party's name may well enjoy the same benefits of ownership of the property as a taxpayer who has held legal title. In both instances, the third party may be the taxpayer's nominee.

*Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007); *accord Scoville v. United States*, 250 F.3d 1198, 1202–03 (8th Cir. 2001). Thus, even if RAJMP never held legal title to the property at issue in this case, the United States may still prevail on its nominee theories against Plaintiffs.

43. In determining the nominee status of the Polittes, the Court finds that the Defendant has met its burden of establishing that the Polittes are and were the nominee of RAJMP. The Polittes do not dispute the that the third factor, a close personal relationship, exists. Defendants have also demonstrated the first factor, that no consideration or inadequate consideration was given by the Polittes. As set forth above, the Polittes' regularly withdrew money from RAJMP which was recorded in a special account called "Due From Shareholders." For 2002, the Polittes owed RAJMP $700,000, for 2003 the Polittes owed RAJMP in excess of $960,000, in 2004 the Polittes owed RAJMP over $1,000,000.00, and in 2005 the Polittes owed over $1.1 million to RAJMP. Where, as here, there is no conveyance of real property, but instead a transfer of funds with which to purchase the real property, the relevant question under the fourth prong of the nominee analysis shifts from whether a conveyance was recorded to "whether the parties adhered to the formalities one would expect them to adhere to", which clearly they did not. *911 Mgmt.*, 2009 WL 2973300, at *25. Furthermore, although RAJMP did not own any real property, between 2000 and 2005 it frequently paid the expenses, homeowner association fees and property taxes of property owned by the Polittes or entities owned and controlled by the Polittes. Finally, and significantly, the Polittes did not observe business formalities in their dealings with RAJMP.

Based upon the foregoing, the Court finds based on the totality of the circumstances, that the Defendant has established that the Polittes were the nominee of RAJMP.

44. In determining the nominee status of TRKSS the Court finds that the Defendant has met its burden of establishing that TRKSS was the nominee of RAJMP. Specifically, the Defendant has established that TRKSS purchased several timeshare condos in Hawaii from RAJMP by waiving a $25,000 debt owed to it by RAJMP. Likewise, RAJMP assigned its rights under a purchase agreement of a Midas store located in Oceanside, CA, to TRKSS for the nominal sum of one dollar ($1.00). RAJMP's financial records reflect that between 1998 and 2001, TRKSS owed RAJMP between $210,000 and $275,000. Based upon the foregoing, the Defendant has satisfied the first and second factors and the Plaintiffs do not dispute the that the third factor, a close personal relationship, exists. The third factor was clearly demonstrated by the fact that RAJMP financed the operations of TRKSS. In 1998, RAJMP transferred a total of $275,000 to TRKSS without a written agreement, terms, or consideration and TRKSS only paid back $65,000 in 2001 without interest. In 2004 RAJMP transferred an additional $50,000 to TRKSS on March 23; another $25,000 on September 15; and an additional $7,500 to TRKSS on September 17. Once again, TRKSS and RAJMP did not observe business formalities in their dealings. Based upon the foregoing, the Court finds based on the totality of the circumstances, that the Defendant has established that TRKSS is the nominee of RAJMP.

### B.    *Alter-Ego Doctrine.*

45. Federal common law governs the application of the alter-ego doctrine in a variety of contexts[17] and in the Ninth Circuit the alter-ego doctrine mirrors that of California.[18] Accordingly, "application of California and federal [alter-ego] law dictate the same result" on questions of alter-ego because they are virtually identical and because alter-ego doctrine is more developed in the California courts, California case law is instructive in this case. *Id.*

---

[17] *E.g., Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 25–26 (1st Cir. 2000) (labor dispute under Railway Labor Act); *NLRB v. West Dixie Enter, Inc.*, 190 F.3d 1191, 1194 (11th Cir. 1999) (unfair corporate labor practices under the National Labor Relations Act); *Thomas v. Peacock*, 39 F.3d 493 (4th Cir.) (breach of fiduciary liability under ERISA), rev'd on other grounds 516 U.S. 349, 353–54 (1994); *NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047 (10th Cir. 1993) (liability for unfair labor practices); *United States v. Pisani*, 646 F.2d 83 (3d Cir. 1981) (liability for Medicare fraud); *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1089–92 (6th Cir. 1974) (liability under Title VII of Civil Rights Act).

[18] *See Ministry of Def. of the Islamic Rep. of Iran v. Gould, Inc.*, 969 F.2d 764, 769 n.3 (9th Cir. 1992) ("California law on piercing the corporate veil is substantially similar to the rule announced in [Ninth Circuit] cases.") (citing *Mesler v. Bragg Mgt. Co.*, 702 P.2d 601, 606 (Cal. 1985)).

46. The California Supreme Court had advocated a flexible approach to applying the alter-ego doctrine, and has adopted two general requirements: (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and; (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Mesler v. Bragg Mgmt. Co.*, 702 P.2d 601 (Cal. 1985) (citing *Automotriz etc. de California v. Resnick*, 306 P.2d 1,3 (Cal. 1957)).[19] "[O]nly a difference in wording is used in stating the same concept where the entity sought to be held liable is another corporation instead of an individual."[20] *Id*.

### 1. First General Requirement of Alter-Ego: Unity of Interest and Owenership

47. With respect to the first general requirement for alter-ego, where one corporation is asserted to be the alter-ego of another corporation California law does not require that one corporation have an ownership interest in the other. Instead, courts may look either for an ownership relationship or for a "substantial unity of ownership and interest." *McLaughlin v. L. Bloom Sons Co.*, 206 Cal. App. 2d 848, 850 (1962) (holding one corporation to be the alter ego of another where neither corporation had

---

[19] Under the Ninth Circuit's federal common law, the courts consider: (1) "the amount of respect given to the separate identity of the corporation by its shareholders"; (2) "the degree of injustice visited on the litigants by recognition of the corporate entity"; and (3) "the fraudulent intent of the incorporators." *Bd. of Tr. v. Valley Cabinet & Mfg. Co.*, 877 F.2d 769, 772 (9th Cir. 1989). Under this federal common law test, a party seeking to pierce the veil must prevail on the first threshold factor and on either of the other two. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir. 1995), cert. denied, 116 S.Ct. 297 (1995) (citing *Valley Cabinet & Mfg. Co.*).

[20] Further, it is not inconsistent to view an entity as viable for the purpose of assessing a corporation tax, while disregarding it for the purpose of satisfying that assessment. *Wolfe v. United States*, 798 F.2d 1241, 1243 (9th Cir. 1986). "A corporation could have a valid business purpose (giving it separate tax status), and at the same time be so dominated by its owner that it could be disregarded under the alter ego doctrine." *Id*. (citing *Nat'l Carbide Corp. v. Comm'r*, 336 U.S. 422, 431–34 & n.13 (1949) (finding insignificant, for the purpose of determining whether a subsidiary corporation is entitled to separate taxable status, the fact that the owner retains direction of the subsidiary's affairs, provides all of its assets, taxes all its profits, and exercises complete domination and control over its business); *see also Harris v. United States*, 764 F.2d 1126, 1128 (5th Cir. 1985) ("[w]hether or not [the corporation] was a separate taxable entity is not the same question as whether it was an alter ego for the purpose of piercing the corporate veil").

an ownership interest in the other).[21] The California Court of Appeals has catalogued a list of factors to be used for establishing the first general requirement for alter-ego liability, among which include:

    (1)    the commingling of fund and other assets;

    (2)    the unauthorized diversion of corporate funds to other than corporate purposes;

    (3)    the sole ownership of all the stock in a corporation by one individual or members of a family;

    (4)    the representation by an individual that he is personally liable for corporate debts;

    (5)    the use of the same office location and employment of the same employees;

    (6)    the undercapitalization of the corporation;

    (7)    the domination or control of the corporation by the stockholders;

    (8)    the use of the corporation as a mere conduit for an individual's business; and

    (9)    the disregard of formalities and the failure to maintain arms-length transactions with the corporation.[22]

48. The Defendant has satisfied the burden of establishing that the factors for the first general requirement for alter-ego liability are met with regard to the Polittes. The Court finds, based on the facts set forth above, that the Defendant has demonstrated the following alter ego factors with regard to the Polittes: (1) a commingling of funds and other assets; (2) the unauthorized diversion of corporate funds by the Polittes to other than RAJMP corporate purposes, such as renovation of the Politte family home in Boulder Colorado, college tuition for the Politte children, purchase of vehicles for Ms. Politte's use in Colorado, season tickets to the Denver Nuggets and Colorado Avalanche, and

---

[21] Plaintiffs rely on the Ninth Circuit's opinion in *SEC v. Hickey*, 322 F.3d 1123 (9th Cir. 2003) in support of a proposition to the contrary. However, as this Court has noted, *Hickey* involved an individual with no corporate ownership interest, rather than a two-corporation situation that is present here. *Id.* at 1126–27. *Hickey* also cited precedent which did not require an ownership relationship between an alter-ego corporation and the principal corporation. *Id.* at 1129 (citing *Riddle v. Leuschner*, 335 P.2d 107 (Cal. 1959)). (*See* Order, Dkt. #120, p. 5 n.3.)

[22] *Assoc. Vendors, Inc. v. Oakland Meat Co, Inc.*, 210 Cal. App. 2d 825, 838–41 (1962); *see also Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1212 & n.3 (1992) ("The appellate court in [Associated Vendors, Inc.] made the heroic effort of cataloguing the factors that courts had considered in determining whether a corporate veil was properly pierced.").

Politte family vacations; (3) the sole ownership of all the stock in a corporation by members of the Politte family; (5) the use of the same office location at 3136 Kurtz St., San Diego, California, 92110 and employment of the same management team for both RAJMP and TRKSS; (7) the domination or control of the corporation by the Polittes, which is evidenced by the fact that Robert Politte wrote the operations manual that governed operations for both TRKSS and the RAJMP, and unilaterally made decisions and changed policies effecting both corporations; (8) the use of the corporation as a mere conduit for the Polittes' various businesses, and personal finances and financing; and (9) disregard of formalities and the failure to maintain arms-length transactions with the corporation.

49. Based upon the foregoing, the Court finds that the Defendant has satisfied the burden of establishing that the factors for the first general requirement for alter-ego liability are met with regard to TRKSS. The Court finds, based on the facts set forth above, that the Defendant has demonstrated the following alter ego factors with regard to TRKSS: (1) a commingling of funds and other assets, which is evidenced by the fact that TRKSS and RAJMP shared the same American Express account and TRKSS allowed its customers to pay with an American Express card and those funds were deposited into RAJMP's account with American Express; (2) the unauthorized diversion of corporate funds by TRKSS to other than RAJMP corporate purposes, such as the financing of TRKSS operations from 1998 to 2004; (3) the sole ownership of all the stock in a corporation by members of the Politte family; (5) the use of the same office location at 3136 Kurtz St., San Diego, California, 92110 and employment of the same management team for both RAJMP and TRKSS, and the fact that TRKSS "leased" its employees from RAJMP without a written agreement, without repayment terms, and TRKSS often failed to repay RAJMP; (7) the domination or control of the corporation by the Polittes, which is evidenced by the fact that Robert Politte wrote the operations manual that governed operations for both TRKSS and the RAJMP and unilaterally made decisions and changed policies effecting both corporations; and (9) complete disregard of formalities and the failure to maintain arms-length transactions with the corporation, which was evidence by the fact that RAJMP would transfer funds to TRKSS without a written agreement, terms, or consideration and, for the most part, without repayment.

### *2. Second General Requirement of Alter-Ego*

50. With respect to the second general requirement for alter-ego, "[t]he kind of 'inequitable result' that makes alter-ego liability appropriate is an abuse of the corporate form, such as under-capitalization or misrepresentation of the corporate structure to creditors."[23] Abuse of the corporate form can be demonstrated by a failure to observe corporate formalities with respect to the flow of money between the two entities.[24]

51. With respect to the second general requirement for alter-ego that an inequitable result will follow if the acts of the corporation are treated as those of the corporation alone, the California Supreme Court has declared that it is not necessary that the party asserting the alter-ego theory prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice.[25] *Gordon v. Aztec Brewing*, 203 P.2d 522, 526 (Cal. 1949). The later alter-ego cases from the California Supreme Court, namely *Mesler* and *Resnick*, are silent on whether bad faith or fraud must be proven in order to satisfy the second prong of the alter-ego doctrine, though neither required such a showing. *See Mesler*, 702 P.2d at 600–07; *Resnick*, 306 P.2d at 3–4. The Ninth Circuit has recognized *Mesler* and *Resnick* and has applied them without requiring a showing of fraud or bad faith.[26]

---

[23] *Orloff v. Allman*, 819 F.2d 904, 909 (9th Cir. 1987) (citing *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543 (9th Cir. 1985)); *United States v. Heathwin-Midtown Convalescent Hosp.*, 511 F. Supp. 416, 418–19 (C.D. Cal. 1981); *Am. Home Ins. Co. v. Travelers Indem. Co.*, 122 Cal. App. 3d 951, 966–67 (1981); *Ivy v. Plyler*, 246 Cal. App. 2d 678 (1966).

[24] *See e.g., Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th Cir. 2001) ("Evidence that a parent provides interest free loans without observing corporate formalities by documenting those loans with promissory notes supports a finding that the parent is the subsidiary's alter ego.") (citing *Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516, 524 (9th Cir. 1984)).

[25] The federal common law does not require showing of "bad faith" either. *See Orloff v. Allman*, 819 F.2d 904, 908–09 (9th Cir. 1987) (citing *Resnick* and stating that "[n]o specific finding of bad faith is required" under California alter-ego law); *RRX Indus. v. Lab-Con*, 772 F.2d 543, 546 (9th Cir. 1985) (citing *Resnick* and stating that "[a] finding of bad faith, however, is not a prerequisite to the application of the alter-ego doctrine under California law."); *see also Valley Cabinet & Mfg. Co.*, 877 F.2d at 772 (stating that under federal common law, "fraudulent intent or injustice" need only be established) (emphasis added); *UA Local 343*, 48 F.3d at 1475 (same).

[26] *E.g., S.E.C. v. Hickey*, 322 F.3d 1123, 1129 (9th Cir. 2003) (citing *Mesler* and not requiring a showing of bad faith); *Orloff v. Allman*, 819 F.2d 904, 908–09 (9th Cir. 1987) (citing *Resnick* and stating that "[n]o specific finding of bad faith is required"); *RRX Indus. v. Lab-Con*, 772 F.2d 543, 545 (9th Cir. 1985) (citing *Resnick* and stating that "[a] finding of bad faith, however, is not a prerequisite to the application of the alter-ego doctrine under California law.").

52. Because the California Supreme Court has not spoken on the alter-ego doctrine since its opinion in *Mesler*, these subsequent decisions by the Ninth Circuit interpreting California alter-ego law are binding on this Court, and also prevail in the event that they conflict with post-*Mesler* decisions of the lower California courts.[27]

53. Where the creditor is the United States and the debt sought to be satisfied by invocation of the alter-ego doctrine is a federal tax liability, the second general requirement, inequitable result, can be deemed satisfied.[28] As such, the Court finds that the Defendant has established that the Plaintiffs are the alter-egos of RAJMP.

//
//
//
//
//
//
//
//
//

---

[27] *See Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983) (stating that the Ninth Circuit's interpretation of state law will remain binding "in the absence of any subsequent indication from the state courts that our interpretation was incorrect"); *Brown v. Gen. Steel Domestic Sales*, No. 08-0779, 2008 WL 2128057, at *5 n.36 (C.D. Cal. May 19, 2008) ("Although a circuit court's prediction of state law is not binding in the same way as is its definitive interpretation of federal law, as a practical matter a circuit court's interpretations of state law must be accorded great deference by district courts within the circuit."); *Brewster v. County of Shasta*, 112 F.Supp.2d 1185, 1188 n.5 (E.D. Cal. 2000) (stating that where Ninth Circuit decisions interpreting California law conflict with decisions by state courts other than the highest state court (such as intermediate and appellate state courts), "the Ninth Circuit obligates adherence by [the district] court to the Circuit's decision and rejection of the non-binding California precedent").

[28] *See United States v. Boyce*, 148 F.Supp. 2d 1069, 1094 (S.D. Cal. 2001) ("[T]he inequity prong is also met because recognition of these entities would allow individuals to evade payment of taxes by simply setting up a trust or other entity to 'hold' and 'manage' property that the individuals are using and receiving benefit from."); *Wolfe v. United States*, 798 F.2d 1241, 1244 (9th Cir. 1986) ("[A] corporation will be disregarded where it is used to evade a public duty, such as the paying of taxes.") (citing *Comm'l Credit Co. v. O'Brien*, 146 P.2d 637, 643, cert. denied, 323 U.S. 665 (1944); *Valley Fin., Inc. v. United States*, 629 F.2d 162, 171–72 (D.C. Cir. 1980) ("[t]he Government's inability otherwise to satisfy legitimate federal tax debts clearly may form a sound basis for such disregard of corporate form"), *cert. denied*, 451 U.S. 1018 (1981)).

*Conclusion*

Based upon the foregoing, the Court finds that the United States has established by a preponderance of the evidence, that Plaintiffs are the nominees/alter-egos of RAJMP and as such, the Plaintiffs' claim for refund under § 7426(a)(4) is DENIED. The Plaintiff's motion, [Doc. No. 321], for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rule of Civil Procedure as to Defendant's alter-ego determination is DENIED. The Clerk of Court is directed to enter judgment for the Defendant.

IT IS SO ORDERED.

DATED: March 21, 2012

Hon. Anthony J. Battaglia
U.S. District Judge